## In re Michael B.*

SUPERIOR COURT

BERDON, J. The defendant, Michael B., now nineteen years old, is being sentenced in four cases on a total of eight counts of sexual offenses involving several younger children. The defendant committed the crimes when he was sixteen and seventeen. Since his plea of guilty, the defendant has been the subject of intensive psychological and physical examinations and evaluations. The court has had the benefit of detailed reports from several prominent psychiatrists, psychologists and social workers. Further, the court has received additional evidence regarding the financial resources available to the defendant, the appropriate governmental agencies, and other matters. The court also heard testimony from the parents of some of the victims. The assistant public defender's and the state's attorney's extensive, thoughtful and scholarly briefs pertaining to this sentencing were both followed by lengthy oral argument. Indeed, in this unusual sentencing proceeding, both the commissioner of mental health and the commissioner of correction have appeared through separate assistant attorneys general. Finally, the defend-

* Thus entitled in accordance with the spirit of General Statutes § 46b-124 and Practice Book § 1058.

ant exercised his right of allocution. The court post-
poned pronouncement of the sentences in order to con-
sider fully this evidence and the arguments of counsel.
It is fitting that the court give its sentences and the
reasons for them in writing.[1]

## I

### THE DEFENDANT'S BACKGROUND

The defendant, Michael B., was born in 1970. He is
a tall, slender white youth who is physically, emotion-
ally and socially younger than his stated age. He is the
oldest of three children. His father lives sporadically
with the family. His mother has been the financial main-
stay of the family and is currently a deposit clerk for
a local bank.

Prior to the incidents which are the subjects of these
proceedings, the defendant appeared to have functioned
well in the community. He was enrolled in the culinary
arts program of a technical school where he completed
the tenth grade and would have been promoted to the
eleventh were it not for these arrests. While at the tech-
nical school, he was not a discipline problem and
received no school suspensions. After school hours he
was employed as a part-time waiter at a congregate
living center for the elderly and was well thought of
by his employer. The defendant was also an altar boy
at the Roman Catholic Church. There is no indication
that he has ever used drugs or alcohol. From a com-

---

[1] "We do indeed do violence to the precept that ours is a government
of laws and not of men if we permit individual judges to sentence in dis-
parate ways, without recording their reasons and without adhering to stan-
dards. But there is no present need or justification, if ever there was, for
a disparate, standardless system. There is at least one country that has
successfully incorporated into its criminal law the obligation of the trial
judge to explain his sentencing decisions. Norway, for many years, has
required its judges to state the reasons for their sentencing decisions." F.
Kaufman, "The Sentencing Views of Yet Another Judge," 66 Geo. L.J.
1247, 1249 (1978).

munity perspective, the defendant gave the outward appearance of a well-adjusted and productive member of society with a promising future. Indeed, his parish priest described him as appearing "as well-adjusted as any other kid."

Behind the closed doors of the family home, however, another very significant story unfolds. Life in the home was chaotic and stressful. The defendant's father is an alcoholic and during bouts of excessive drinking was physically abusive to the defendant and his mother. At times the defendant was frightened for his and his mother's safety. The father, when under the influence of alcohol, repeatedly sexually victimized the defendant when he was between the ages of twelve and fifteen in the same manner that the defendant perpetrated the crimes on the minor male children involved in these cases. This abuse obviously set the stage for the defendant's criminal behavior.

## II

### THE CRIMES

In the first case, the defendant pleaded guilty to one count of sexual assault in the first degree in violation of General Statutes § 53a-70 and to one count of injury or risk of injury to a minor in violation of General Statutes § 53-21 in connection with an incident that occurred in December, 1986, involving a very young male friend of the defendant's brother. In the second case, the defendant pleaded guilty to one count of sexual assault in the first degree in violation of § 53a-70 and to one count of injury or risk of injury to a minor in violation of § 53-21 in connection with four separate sexual assaults that occurred during the spring of 1986 involving an eight year old male victim. In the third case, the defendant pleaded guilty to two counts of sexual assault in the first degree in violation of § 53a-70 in connection with an incident that occurred in July,

1987, involving a nine year old boy. In the fourth case, the defendant pleaded guilty to one count of attempted sexual assault in the first degree in violation of General Statutes § 53a-49 (a) and § 53a-70 and to one count of injury or risk of injury to a minor in violation of § 53-21 in connection with an incident that occurred in July, 1987, involving an eleven year old girl.[2]

Obviously the defendant's own victimization by his father was an important factor contributing to his criminal conduct, and, although he committed these crimes when he was only sixteen and seventeen years old, and, although these crimes were committed as a result of serious psychological disorders, criminal prosecution for these incidents is important. "Prosecution should be a component of most interventions with juvenile sex offenders. [Juvenile is defined as a person under eighteen.] Prosecution provides support for the victim's rights, a means to insure victim and community safety, and a mechanism to prevent further victimization. The seriousness of the offender's abuse or the impact on the victim is not significantly different because the offender is not a legal adult. Legal accountability is important for offenders in developing self-responsibility. Victim empathy is a trait which offenders do not possess initially. Direct participation in the prosecution process is helpful to the offender. He needs to hear his behavior described as illegal, unacceptable, and having an impact on the victim. Prosecution also provides a strong and critical means for insuring offender cooperation with treatment and control through court orders. Documentation of offenses through prosecution is also essential for future control of sexual aggression." Preliminary Report from the National Task Force on Juvenile Sexual Offending, 1988, 39 Juv. and Fam. Ct. J. No. 2.14 (1988).

---

[2] There are pending in these files other counts that will be nolled at this sentencing hearing.

## III

### THE DEFENDANT'S PSYCHOLOGICAL EVALUATION

The defendant was examined and evaluated by: Maria S. Tupper, of the Sexual Abuse Treatment Program, sponsored by the Child Guidance Clinic for Central Connecticut, Inc., and the Meriden-Wallingford Hospital; Michael Hoge, clinical psychologist of the department of psychiatry of Yale University School of Medicine; Ann Hoefer, psychiatrist of the department of psychiatry, Yale University School of Medicine; Earle L. Biassey, psychiatrist, diagnostic unit chief, Whiting Forensic Institute (Whiting); Hillard Foster, director for psychological services, Whiting; William Frederick Hobson, director of the sex offender program at the Connecticut correctional institution at Somers; and David A. D'Amora, psychotherapist, director of the Special Services Program (a nonprofit sex offender program) at the Connecticut correctional institution at Somers. The foregoing persons will hereafter be collectively referred to as the professionals.

The court, pursuant to General Statutes § 17-244, committed the defendant to the commissioner of mental health for a complete physical and psychiatric examination at the diagnostic unit at Whiting. In a report (hereinafter referred to as the Whiting report) the Whiting evaluation team, led by Biassey, the diagnostic unit chief, and assisted by Foster and others, listed the defendant's diagnosis as pedophilia (the same sex, exclusive type).[3] It is abundantly clear, as reported by

---

[3] The complete diagnosis was as follows:

"AXIS I—302.20 Pedophilia, same sex exclusive type.

"AXIS II—301.90 Personality Disorder, NOS (sadistic personality disorder).

"301.84 Passive/Aggressive Personality Disorder.

Hoge, that "this sexual deviation of pedophilia appears to result in part as an effort to discharge the anxiety he experiences in his chaotic home situation, in part [as] a learned pattern of behavior acquired through the sexual experiences with his father, and in part as [a] psychologically defensive maneuver to hurt others before they can hurt him. . . . His sexual relationship with his father has played such a significant role in his current sexual behavior, that at times he appears to suffer from identity confusion with his father as he describes his own behavior."

## IV

### TREATMENT PLAN

The professionals who examined and evaluated the defendant unanimously agreed upon a treatment plan that would be appropriate for him. First, all agreed that the defendant is not a candidate for community based treatment at the present time. He is a danger to himself and to others. The treatment he receives must initially be in a structured environment, but not punitive. Second, all have cautioned that the defendant should not be placed in a penal institution where he would be subject to sexual abuse. Third, all agree that the defendant should be treated in a therapeutic environment with other youthful sex offenders. This program should include intensive psychotherapy and have a strong educational component so he can be re-educated to function as a more effective member of the community. In addition, the program should be age specific and should enable the defendant to develop more social skills and appropriate interaction in order for him to achieve a healthier and more adult attitude. It was fur-

"301.82 Avoidant Personality Disorder.
"AXIS III—Severe visual defect of left eye, apparently congenital. Perceptual/spatial deficit secondary to left eye development dysfunction by neuropsychological testing."

ther recommended that, after the defendant completes this residential portion of the program, he receive outpatient therapy at a facility such as the Sexual Abuse Treatment Program. Finally, all the professionals agree that the defendant is a good candidate for treatment. He is young, cooperative, insightful about his problems, and has expressed a sincere interest in obtaining help to alter his behavior.

There is no private or public program within Connecticut which provides for the type of treatment for youthful sex offenders that was recommended by the professionals. Tupper, after enlisting the aid of Fay Honey Knopp, the director of the Safer Society Program and Press, a nonprofit nationwide referral service for specialized treatment and placement of male and female juvenile and adult sexual offenders, performed an in-depth study of available out of state facilities. She reported the results of her findings to Whiting. Biassey and his staff evaluated this information, and recommended in the Whiting report the following: The defendant "should be sentenced according to his conviction and placed for care, custody and treatment in a *secure treatment facility* with recognized and tried programs for the treatment of young sexual offenders. These are listed in an appendage to this report." (Emphasis added.) The facilities recommended are: Northwest Passage of Salt Lake City, Utah, High Plains Youth Center of Burch, Colorado and NEXUS Programs, Inc., of Minnetonka, Minnesota.

Upon further study, Tupper concluded that the program at Northwest Passage appeared to be the most appropriate for the defendant. It is a program designed specifically to treat youthful sexual offenders to the age of twenty-one. Although it is not locked, it is a secure facility with staff on duty twenty-four hours a day and continuous monitoring of the patients. It provides a program of intensified group therapy at a cost of $26,250.

for the first year and $25,200 for the second year. It is anticipated that the defendant would be required to be in the program for about two years. The director of Northwest Passage has reviewed all of the reports on the defendant, including his physical and psychological evaluations, and has concluded that he would be a good candidate for the program. Finally, the defendant has stated that he desires to enter this program.

## V

### SENTENCING GUIDELINES

Arriving at a just sentence is a grave responsibility for the court. *State* v. *Candito,* 4 Conn. App. 154, 493 A.2d 250 (1985). In this state, very few standards have been established to guide the court in imposing a sentence. Unlike the federal government; Sentencing Reform Act of 1984, 18 U.S.C. § 3551 et seq.; *Mistretta* v. *United States,* 488 U.S. 361, 109 S. Ct. 647, 102 L. Ed. 2d 714 (1989); Connecticut has failed to adopt appropriate criteria for sentencing. In Connecticut a sentence generally is not subject to appellate review as long as it falls within the statutory limits. *State* v. *Huey,* 199 Conn. 121, 126, 505 A.2d 1242 (1986). Those statutory limits provide for wide ranges between minimum and maximum penalties. For example, the statutory range for the crime of sexual assault in the first degree in violation of § 53a-70 is one to twenty years. The judicial department long ago ceased publishing the decisions of the sentence review division, which was established to ameliorate the disparities in sentencing. General Statutes § 51-194 et seq.; *State* v. *Nardini,* 187 Conn. 109, 118–19, 448 A.2d 1317 (1982). Although the division has reduced the extremes of the inequitable distribution of penalties imposed on similar offenders for similar offenses, this type of review by coordinate judges has been subject to criticism. F. Kaufman, "The

Sentencing Views of Yet Another Judge," 66 Geo. L. J. 1247, 1250 (1978). Indeed, "[w]hat happens to an offender after conviction is the least understood, the most fraught with irrational discrepancies, and most in need of improvement of any phase in our criminal justice system." *United States* v. *Waters,* 437 F.2d 722, 723 (D.C. Cir. 1970); see generally M. Frankel, "Lawlessness in Sentencing," 41 Cin. L. Rev. 1 (1972).

The court does not suggest that sentences should be computerized. Trial judges should always have the discretion of deviating from a standard, provided the judge adequately explains the deviation. "Few legal principles are either as ancient or deeply etched in the public mind as the notion that punishment should fit the crime. This familiar maxim, however, is only half-true. '[I]n the present century the pendulum has been swinging away from . . . the philosophy that the punishment should fit the crime and toward one that the punishment should [also] fit the criminal.' " *United States* v. *Barker,* 771 F.2d 1362, 1365 (9th Cir. 1985), quoting W. LaFave & A. Scott, Criminal Law (1972) § 5, p. 25.

Nevertheless, there are some guiding principles that the court must look to when imposing a sentence. First, and most important, is that " 'the sentence imposed in each case should call for the minimum amount of custody or confinement which is consistent with the protection of the public, the gravity of the offense and the rehabilitative needs of the defendant.' " *State* v. *Huey,* supra, 131 (*Healey, J.,* concurring), quoting ABA Standards Relating to Sentencing Alternatives and Procedures, Approved Draft § 2.2. Additionally, four traditional goals of criminal punishment have been identified: retribution, deterrence, isolation and rehabilitation. *State* v. *Huey,* supra. With respect to certain crimes, the victims must be taken into account when considering these factors. General Statutes § 54-91c.

## A

### RETRIBUTION

The defendant has been punished for his acts. He has been incarcerated for pretrial detention for a period of one year and nine months, the equivalent of approximately two and one-half years in prison.[4] Part of that period of incarceration was under the severest conditions. For some thirteen months, he was incarcerated at the community correction center in New Haven where he remained in segregation to prevent his victimization by other male inmates. Since he has been at Whiting's diagnostic evaluation center, he has been confined without treatment.

To impose a lengthy sentence just for retributive purposes not only overcrowds our prison facilities, but can be counterproductive. The sentence review division of the Superior Court recognized this over twenty years ago when it held the following: "[I]f there is any possibility of rehabilitation, we are inclined to believe that the 'law of diminishing returns' comes into play when too staggering a sentence is imposed upon a person who is twenty-one years of age." *State* v. *Radwick,* 27 Conn. Sup. 63, 66, 229 A.2d 364 (1967).

## B

### DETERRENCE

To the extent that deterrence can be a factor in the type of compulsive behavior that led to the crime committed by the defendant, a sentence of two and one-half years serves that purpose. "Central to our system of values and implicit in the requirement of individualized sentencing is the categorical imperative that no person may be used merely as an instrument of social

---

[4] This is after good time credit of ten days per month is applied. General Statutes § 18-98.

policy, that human beings are to be treated not simply as means to a social end like deterrence, but also—and always—as ends in themselves. . . . Deterrence is not inconsistent with this principle, but the principle does demand that a balance be struck between the goal of general deterrence and the enlightened imperative of individualized sentencing." (Citations omitted.) *United States* v. *Barker,* supra, 1368–69.

## C

### ISOLATION

Nevertheless, it is clear that the defendant cannot be returned to the community. Every professional who has evaluated the defendant has found that, in his present state, he is a danger to himself and to the community. The Whiting report summed it up as follows: "Michael is considered both a danger to himself and others. . . . He is not considered appropriate for placement in the community." The defendant does not seek to be returned to the community and neither his mother nor counsel advocates that he should be returned at this time. Rather, they seek appropriate treatment for his psychiatric problems.

## D

### REHABILITATION

In fashioning an appropriate sentence, rehabilitation is a significant factor. *State* v. *Huey,* supra, 131 (*Healey, J.,* concurring); R. Dawson, Sentencing: The Decision as to Type, Length and Conditions of Sentence (1969). In a case like this, where the basis of criminal behavior is a psychiatric disorder, it assumes paramount importance. Rehabilitation, in this case, means appropriate treatment that would address the defendant's problem.

It is not only important in order for this young person eventually to lead a productive life, but it is also crucial for society. No matter what sentence is imposed upon the defendant, even if further incarceration was appropriate, he would eventually be released into the community. As pointed out in the Whiting report, "[h]is condition can become even more dangerous." This was further emphasized by every professional who testified before the court.

The statistics are even more compelling. "A common finding in the biographies of adult convicted rapists and child molesters and research on their offending patterns indicates between one-third and one-half committed their first sexual offense during adolescence." J. Weiks & D. Lehker, "Specialized Treatment of Adolescent Sex Offenders in a Juvenile Court Setting," 39 Juv. and Fam. Ct. J. 29 (1988). Indeed, Tupper testified that the defendant could continue to cause serious societal problems if he remains untreated. It, therefore, becomes imperative that the criminal justice system focus on rehabilitation for the defendant by making available through its sentencing jurisdiction appropriate treatment that will address his problems.

## VI

### STATUTORY SCHEME OF SENTENCING

In order to meet the defendant's rehabilitative needs and to protect the victims and the general public, the court is limited to the following alternatives: confinement under the care and custody of the commissioner of mental health at Whiting; confinement under the care and custody of the commissioner of correction either for general incarceration or at the John R. Manson Youth Institution; or probation under the control of the office of adult probation.

## A

COMMISSIONER OF MENTAL HEALTH

The defendant's counsel first argues that the defendant should be sentenced and committed to Whiting under the custody, care and treatment of the commissioner of mental health and that "he remain at Whiting Forensic Institute until such time as the Department of Mental Health arranges for the financing and transfer of him to the Northwest Passage Program in Utah or some other comparable program."

Whiting's statutory mission clearly mandates that the commissioner provide for treatment of persons such as the defendant. See *State* v. *Hanson,* 12 Conn. App. 32, 42, 529 A.2d 720 (1987). General Statutes § 17-239 provides in part: "The Whiting Forensic Institute shall exist for the care and treatment of . . . persons convicted of any offense enumerated in § 17-244 who, after examination by the staff of the diagnostic unit of the institute as herein provided, are determined to be mentally ill and dangerous to themselves or others and to require custody, care and treatment at the institute . . . ." Section 17-244 specifies those sex offenses involving "(1) physical force or violence, (2) disparity of age between an adult and a minor or (3) a sexual act of a compulsive or repetitive nature. . . ."

The defendant fulfills all of the requirements of § 17-239. First, in regard to § 17-244, although he is only required to fit into one category, the defendant satisfies all three. He has been convicted of a sex crime involving physical force, disparity of age and compulsive sexual acts. Second, the defendant is mentally ill having a pedophiliac diagnosis, a mental disorder defined in the American Psychiatric Association's

"Diagnostic and Statistical Manual of Mental Disorders." See General Statutes § 17-207a (a). Third, he is a danger to himself and to others.

The legislative history of § 17-239 also makes clear that the commissioner is obliged to provide for appropriate medical treatment for persons such as the defendant. Strong support for a hospital to treat mentally ill persons who commit crimes, including crimes involving sex, was demonstrated before the legislature. Among those who appeared before the legislature in 1957 to urge the adoption of legislation to establish Whiting was former Chief Justice William M. Maltbie, who urged that there be a hospital for a person "who has committed a crime because of some mental weakness perhaps, because of some emotional disturbance or because there is in his mind some fence which the ordinary practices of cure of the criminal cannot by any possibility reach." Conn. Joint Standing Committee Hearings, General Law, Pt. 2, 1957 Sess., p. 511.[5]

The commissioner of mental health, through counsel and by way of reports and testimony from Robert T. M. Phillips, the director of forensic services and director of Whiting, refuses to consent to the defendant's confinement at Whiting. He justifies his position on two grounds.

First, Phillips points out that there is no treatment program for youthful sex offenders at Whiting. This is correct. It is also clear that there is no such program for any category of sex offenders except as may be incidental to programs directed toward other psy-

---

[5] The court recognizes that statements at public hearings by nonlegislators are not admissible as means of interpreting legislative acts. *Savings & Loan League of Connecticut, Inc.* v. *CHFA,* 184 Conn. 311, 315 n.1, 439 A.2d 978 (1981). The legislative record, however, is replete with statements by legislators that the intent of the legislation was to provide treatment for persons who are mentally ill, including sex offenders. 7 H.R. Proc., Pt. 7, 1957 Sess., pp. 3613–19; 7 S. Proc., Pt. 7, 1957 Sess., pp. 4008–11.

chiatric disorders. Notwithstanding the clear statutory mission of Whiting, Phillips justifies this default by pointing out that the legislature has failed to fund a program for treating youthful sex offenders. It is clear, however, that an appropriation was never requested for such a program in spite of the fact that there appears to be an increasing number of adolescent sex offenders in need of these specialized services. Next, Phillips attempts to justify the lack of a program by claiming that the treatment of youthful sex offenders is merely experimental. The overwhelming weight of evidence before this court is that the treatment of youthful sex offenders is not experimental. Indeed, every professional who reported or testified before this court, including Biassey, Whiting's diagnostic unit chief, and Foster, Whiting's chief of psychological services, joined in recommending the treatment plan for the defendant that they found to be appropriate medical treatment. Phillips' testimony must be put in its proper perspective. He concedes that he is no longer a practicing clinician but an administrator. Phillips also concedes that he was not aware of the content of the programs recommended by his professional staff and that at least the psychotherapeutic aspect of the program for the treatment of youthful offenders is not experimental.

When the court inquired what has occurred in the past to other youthful sex offenders in the criminal justice system, Foster replied: "Many of them are falling through the cracks. There are a number of programs . . . of stopgap measures, but none of them seem to be, in my opinion, a very effective treatment format for people between 15 and 21 years of age for sexual offenses that they may have committed; and without that kind of treatment we simply incarcerate people, expose them to the same environment that produced their initial sexual behavior, and they are released five

or ten years later and continue to perpetuate the crime and create other victims that end up in courtrooms. It is a very devastating series of events, and it would be ideal if we had a treatment facility or program that was targeted specifically to people in his age range who do not have a long history of sexual offenses and who were victims at one time themselves."

The failure of the commissioner of mental health to meet the important state need of providing psychotherapeutic treatment for youthful sex offenders can hardly be justified. This is especially so since the evidence before this court indicates that youthful sex offenders respond more readily to treatment than do older persons. It appears that if priorities for treatment must be established, it is a poor choice to ignore the youthful offender such as the defendant who, if he remains untreated, can continue to cause serious societal problems.

The second reason advanced by the commissioner of mental health for refusing to consent to the defendant's incarceration at Whiting is that he has no authority to provide for the defendant's treatment in a facility outside of his control such as Northwest Passage. This, however, is too narrow a reading of the statutes. The commissioner has authority to treat a patient who is under his care and control not only at Whiting but at any other institute. An institute is broadly defined and can include a facility outside Connecticut. General Statutes § 17-238.

Nevertheless, the court is without jurisdiction in this matter to sentence the defendant to the custody, care and treatment of the commissioner of mental health at Whiting. The legislature has made clear that "no court may order such confinement if the report does not recommend confinement at the institute." General Statutes § 17-245. The defendant argues that since the

report recommended treatment at out-of-state facilities and those out-of-state facilities fall within the definition of an institute, then the report implicitly authorized sentencing to Whiting. Any ambiguity in the Whiting report, however, is clarified by Phillips in his February 14, 1988 letter to this court when he refused to accept the defendant at Whiting.

## B

### COMMISSIONER OF CORRECTION

Committing the defendant to the custody of the commissioner of correction, except for a very limited period of time, would not be appropriate whether the placement is at Somers or at the Manson Youth Institution or at any other prison facility within that department for several reasons.

First, as discussed previously, the defendant has been fully punished for his conduct and the retributive aspect of the sentence has been satisfied. The American Bar Association's Standards for Criminal Justice makes clear that "neither community hostility to the defendant nor the apparent need of the defendant for rehabilitation or treatment provides acceptable reasons for imposing a sentence of total confinement." Standard 18-2.5 (c); *Pears* v. *State,* 698 P.2d 1198, 1204 (Alaska 1985).

Second, even if the defendant's dangerousness could justify further incarceration in a penal institution, the department of correction does not have an appropriate treatment program for youthful offenders. Appropriate treatment for the defendant, as previously indicated, is through intensified psychotherapeutic groups with peers, that is, persons of approximately the same age, to take place in a therapeutic setting. This kind of treatment is not available at Somers or at the Manson Youth Institution or at any other facil-

ity operated by the commissioner. At Somers, the sex offender program consists of an average of two and one-half hour sessions per week. More important, the program would be with a much older population and in a penal institution. The sex offender program at the Manson Youth Institution consists of one weekly session led by a social worker which is also inappropriate for the defendant.

Furthermore, all the professionals believe that the defendant is vulnerable to sexual assault if he were placed in a penal institution. If he participated in the sex offender program at Somers he would be identified as such by the general prison population and would be at risk of being sexually assaulted.[6] Even placing him in protective custody[7] would not guarantee that he would be protected from abuse and such solitary confinement in a cell or dormitory would be harmful to a young person like the defendant. Recently the Connecticut Law Tribune reported on the case of another youthful sex offender who was incarcerated for a long prison term with the commissioner of correction. "The individual was raped by two inmates his first night in custody. He reported the incident, triggering an investigation. Within days the word was out among inmates: [He] was lower than a child molester; he was a snitch, too. [He] says a contract was put out on his life. In seven years of protective custody, he was repeatedly assaulted; he was attacked by a knife-wielding inmate who slashed at his jugular; his hair was set afire and his nose broken." 14 Conn. L. Trib. 30, p. 10 (1988).

---

[6] Indeed, many inmates do not attend the program as Hobson, the director of the sex offender program at Somers, explained because they "are fearful that automatically they are labeled a sex offender."

[7] Protective custody is a specialized status requested by inmates or in which some are placed for their own protection. Generally speaking it is for people who feel they are at some risk or at some danger of assault by other inmates. They would be confined for a major part of the day to the custody area so that they are protected from the general population.

See *State* v. *Davis,* 190 Conn. 327, 461 A.2d 947, cert. denied, 464 U.S. 938, 104 S. Ct. 350, 78 L. Ed. 2d 315 (1983).

All the professionals agree that if these attacks occurred on the defendant it would be devastating for him. Foster, of Whiting, testified as follows: "I think . . . [the prognosis] is pretty dismal [if the defendant were sent to Somers]. Given the sexual assaults that he experienced in early adolescence between 12 and 15 [and] the effect that has produced on a very sensitive individual, to place him in a correctional facility where people would be far more violent, far more abusive, far more assault[ive] . . . [would] further destroy his sense of values and trust in society. I think that the outcome would be devastating and inevitably he would be back into society and even if, at that point he had received treatment, the effectiveness of that treatment after that exposure would be considerably minimal by comparison. The recidivism rate among sexual offenders, older ones, is just incredible. There do not seem to be effective treatments for older sexual offenders; and to put him in that environment and with that population, the outcome would be devastating . . . both in terms of the patient and in terms of society. . . . I think it is the [Whiting] team's feeling in a large part, but also my own personal feeling, that society's best interest, no matter what the cost, and . . . the cost may actually be less both financially and socially to Connecticut, if it were able to provide treatment for [the defendant] at this early state." This was further emphasized by Biassey, of Whiting, when he testified that "[i]f we send him to Corrections, we are doing something that is harmful to him and society." Indeed, the diagnostic unit's grave concern for the defendant was demonstrated when it recommended in the Whiting report that, during the period of time prior to sentencing, he remain at Whiting.

## C

### PROBATION

The only remaining alternative for the court is to structure the defendant's sentence to allow him to be placed on probation, the condition of which would be appropriate treatment in a secure facility such as Northwest Passage in Utah and, thereafter, community supervision. This is the unanimous recommendation of the professionals. The court is clearly authorized to structure a program for the defendant's treatment as a condition of his probation. General Statutes § 53a-30 provides in part that the court is authorized to impose as a condition of the defendant's probation that he "undergo medical or psychiatric treatment and remain in a specified institution, when required for that purpose . . . [or] satisfy any other conditions reasonably related to his rehabilitation."

The defendant, however, is indigent and his family has no assets, health plan or other resources that would enable them to pay for the cost of the program at Northwest Passage. Surely, the office of adult probation has authority to pay for the defendant's care at Northwest or to make appropriate arrangements with other governmental agencies. General Statutes § 54-103b provides: "The office of adult probation shall implement liaison with local community service providers throughout the state for the purpose of improving services delivery for probation referrals. Contractual services purchased shall be predominantly for the purpose of, but not limited to, employment, psychiatric and phychological evaluation and counseling, drug and alcohol dependency treatment, and other services towards more effective control and rehabilitation of probation referrals. Other outside professional ser-

vice fees consonant with the primary purpose of improved direct services shall be within the scope of the authority granted by this section."

The court is well aware that the office of adult probation has a limited budget for these services. Jack Brooks, research and planning officer for adult probation, testified that the total funds budgeted for an entire year for sex offender services was $25,000. Of course, the cost for keeping the defendant at Northwest for one year would slightly exceed that entire annual budget. Other resources, however, are available. For example, the following was reported to this court by the probation officer: "Through the Department of Income Maintenance's Title 19 Program, the offender would appear eligible for benefits which would pay for his treatment at Northwest Passage if that program meets Title 19 requirements of being a 'medical-psychiatric' model and not strictly a behavior modification program."

Although the statute imposes upon the commissioner of mental health the primary duty of providing appropriate treatment for persons such as the defendant, the court cannot allow him to "fall through the cracks." Since the burden of making the appropriate arrangements for the treatment of the defendant is also consistent with adult probation services, in this case the office of adult probation must assume that function no matter where the funds may come from.[8] It is important that the defendant *not* be released into the community before he receives the necessary treatment.

---

[8] The defendant has raised several constitutional issues if he should remain incarcerated in a penal setting without appropriate treatment. Among the arguments is that the state cannot incarcerate him for the sole reason that he cannot afford appropriate treatment in a therapeutic milieu. See *Bearden* v. *Georgia,* 461 U.S. 660, 103 S. Ct. 2064, 76 L. Ed. 2d 221 (1983). In addition, the defendant contends that although he has no constitutional right to be placed on probation, once probation is granted it cannot be revoked

## VII

### THE VICTIMS

The court has not forgotten the plight of the minor victims in this matter. The psychological scars they received as a result of the crimes committed by the defendant can never be erased through the court's sentence. The parents of the victims expressed their concern about their children, but they also recognized that the defendant was mentally ill and above all required treatment. The best interests of all concerned will be served by a sentence that will impose (1) incarceration for approximately the period of time the defendant has already served, (2) probation with mandatory treatment in a secure facility and supervision once the defendant is released into the community with appropriate outpatient treatment, and (3) a lengthy sentence if the probation should be violated.

## VIII

### THE SENTENCE

The effective sentence that the court will impose on the defendant in all four cases will commit him to the commissioner of correction for a period of nine years, suspended after two years and ten months and place him on probation for five years.[9] The major conditions of his probation will be treatment in a secure facility to be followed by community based treatment and a

---

because he is unable to pay for the treatment. See *Gaines* v. *Manson,* 194 Conn. 510, 481 A.2d 1084 (1984); *D'Amico* v. *Manson,* 193 Conn. 144, 476 A.2d 543 (1984). "In the exercise of such a right, invidious discriminations, such as between rich and poor, implicate constitutional guarantees of due process and equal protection of the laws." *D'Amico* v. *Manson,* supra, 147. These constitutional issues need not be addressed at this time.

[9] Although the court is of the opinion that the period of probation in cases such as this should extend for a longer period, five years is the statutory maximum. General Statutes § 53a-29.

directive that he have no contact with any victim or the families of any victim. This will mean incarceration with the commissioner of correction for an additional period of approximately three months (after good time credit), which will give the office of adult probation time to make the necessary financial arrangements in order to send the defendant to Northwest Passage. Adult probation, however, should consider this time schedule to be the maximum and the court would expect that the arrangements will be made in a shorter period. The court, after the arrangements are made by adult probation, will reduce the time to be served under the provisions of General Statutes § 53a-39 in order to allow the defendant to attend the program as soon as possible.

During the short period the defendant is in the custody of the commissioner of correction, the court expects that he will be confined in a safe place where he will not be subject to abuse and where appropriate services will be made available to him.

The office of adult probation will take immediate steps to secure the necessary funding in order to carry out the terms of the defendant's probation and to make the arrangements to transport the defendant to the program.

A copy of this memorandum, in addition to the usual distribution, will be sent to the director of adult probation and the supervisor for adult probation for the judicial district of New Haven.